So, should we proceed or are there? Okay, we will proceed. It is counsel, Lynn. May it please the court, my name is Charles Kinnunen. I represent the petitioner, Wayze Lynn. And as a preliminary matter, I filed this case in January 10th of 2005 and failed to include what I think is a very important case that the government was observant enough to put in the record in her brief. That decision came out in November of 2004 and it talks about the issue of forced sterilization. In this particular case, Mr. Lynn is an illiterate father of four. He has a dialect that is very difficult to translate. But we had a translator at the merits hearing in Mandarin and they communicated back and forth well enough to present the case to the court. Were you representing him at that time? Yes, Your Honor. Now, what was the reason why, I mean, is there some issue why you couldn't find a, was it Fuzhou interpreter? Fuzhou is very difficult. There's one, I think there are two that I've seen. One comes from New York City and he appeared on Guam that day, didn't know he had two cases and had already scheduled his flight back to New York City. Apparently there are many more Fuzhou speaking people in New York City because of the size of New York that they just have to allocate their resources and send him. Actually, he was out on Guam when there was the big exodus of people who came, Chinese people, but they had transferred him to New York. So he's a, that's the problem. It's just very small but significant for Guam because many of our asylum applicants come from that, speaking that dialect. How did the asylum applicants from China get to Guam? Normally, Your Honor, they, in the past, they came to Guam on fishing vessels. There was a big exodus at one time. They had a big vessel loaded with Chinese who came to Guam. They were all transported quickly by airplane to have their asylum interviews and merits hearings heard off of Guam in the mainland. And so people heard about this in China. Then we continued to get boatloads and they said no more free plane rides to the States. We're going to set up a system on Guam where we hear these cases. So we filtered through that. There was quite an army of Chinese immigrants detained in the Department of Corrections at the time. Tent City, they called it. That's when I appeared on the scene to help those. And those have been now, those cases have all been heard. And because of the 9-11 attack, there are no more fishing vessels that reach the port of Guam. All those fishing vessels are offloaded out at sea. So there is no opportunity even for the fishermen to jump into the harbor, which is what they were doing towards the end, clinging to the buoys and whatnot and claiming asylum. Well, that's kind of the IJ's finding that the sterilization of Lin's wife was not forced. He makes a finding that it does not appear that the surgery was done without the willingness of the respondent and his wife. Thank you, Your Honor. When we hear these cases, of course the judge is in. This was a merits hearing that was long distance. Me and the client are in Guam, and the judge is here in Honolulu, and we do a video conference. So that's also part of the problem. But in this case, I think of the judge. You and your client were in Guam. The judge is in Honolulu. Where's the translator? The translator is also with us. It can be either place. The translator can be here in Honolulu. In this case, where was the translator? I think in this case, I believe the translator was with us in Guam. And I also believe, if I'm not mistaken, Your Honor, that this – oh, okay. I was studying the wrong case. This case was not argued by me. This was argued by William Bischoff. I only got the case on a PVC. All right. Thank you. I'm sorry. But I do know that – I do know the Foujou problem, and this is the Foujou problem. Well, even the interpreter said she was having a hard time. Yes. She said on the record she was having a hard time. Yes. Thank you, Your Honor. But let's get to the heart. As your time is running out, I would really like to get to the heart of your challenge, too. Sure. There were six questions that I think were very important in the record. Did she go to the hospital herself, or did someone take her there? This is AR-76. Yes, Your Honor. Line 5. Okay. Yes. Did she go to the hospital herself, or did someone take her there? Well, I was working units for her then. You can see the nonresponsive nature because the questions are – he can't speak Mandarin. Second question, did she know she was going to have the operation? Yes. Okay. Well, that doesn't mean it's voluntary. If she knew she was going to have the operation. The third question, did she try to run away or anything? Well, she did not run away because she was already given the notice. Had she tried previously to run away? Yes, Your Honor. There are four children. They had avoided the – And had – after the birth of the son, that is to say after the birth of the fourth child, had she tried to run away? No. At that point, they couldn't run any further. They had four children, and it's very difficult for them to run. So instead of running – I may be wrong. My impression is that she had tried once to run away even after the birth of the son, after she'd been notified. I may be wrong on that. Okay. Well, that's not clear to me in the record that what was happening after the birth of the son because a lot of things were happening. They're trying to register the children for school, which they cannot do if they haven't paid their fines, and if they don't have a registration, which they didn't have because of their prior violations of one-child policy. So in order to get a family registration, they have to show up and be made accountable. And I think what he was trying to say was that because they had four children and the children were getting – at a school age, they have to take a different approach. They had run away from the government to have four children in order to have the son. That's, to me, a resistance. And so they had to pay the fine in order to get registered. After we paid the fine, the government said it had to go forward into litigation just like that. Okay. Now that doesn't seem to me to be an admission that it was a voluntary thing. It seems to me quite the opposite. But the one final question. Which state of mind are we looking at? Are we looking at Lynn's state of mind or the wife's state of mind? Well, that's also important in these cases, Your Honor. The spouse comes here to Guam having the responsibility of caring for a family and paying these fines, paying for fines even to get litigation, I mean the tubal ligation, even after they're fined for the violation. So his concerns are basically I suffered through four children with this government policy and now I have my son. He can provide for me in my later years. Therefore, I'm happy. And I think that's the big picture that this particular man tried to express. That doesn't necessarily mean that the tubal ligation of his wife was voluntary. Of course. And that's very good. Thank you, Your Honor. That's true. The sixth question then was very inconsistent with the prior questions. At that point, the judge just apparently cut off the testimony and said. At what point was this? After AR-77. AR-77. What the judge seems to have focused on was line 14. Did she do this? Was she happy to do this? Answer, willing. Had to be willing to go for the operation, the sterilization. Question, you're saying that she was willing to go? Answer, as to the sterilization issue, at one time my wife ran away, but then the government noticed us, notified us, and asked her to return to go for the operation. And why did she not run away the second time? Well, extra children were being fined. Asked them to borrow the money. We didn't have the money. Yes, thank you, Your Honor. That pretty much is how he responds to the questions. Well, what about the confiscation of the house that he refers to in his affidavit of February 17? Yes, that was very early on, and that's also a punishment. It's a compelling factor, and it's resistance and it's punishment for resistance. And I don't know how. I read this as they confiscated his house because he didn't comply with their policies. Yes, Your Honor. But there is evidence that they do those things in China. Giving a hint to the other side. All right, thank you, Your Honor. So would you explain a little bit about, I've seen this in a number of cases, when the government says, and I've seen it not that articulately by the petitioner, but they say the government gave us notice. Notice, what is that? What does that mean? It can be a cadre. It's oftentimes a cadre of local officials that come and give notice that they have violated the policy. Sometimes the notice comes with a fine. Sometimes the notice is simply people knocking on the door and demanding that they appear for sterilization or tubaligation. And if they don't appear and they're caught? Then it's simply force by force in any regard. If they know they're noticed, I believe that there's no voluntary, they can't volunteer after they've been told they have to go. So that's a compulsion. It's the compulsion that causes them to qualify for forced relief under the forced sterilization. All right, thank you, Counselor. You've exceeded your time. I'll hear from the government. Thank you. May it please the Court, my name is Jennifer Paisner, on behalf of the respondent, the United States Attorney General. The issue in this case, as presented by Mr. Lynn in both his testimony before the immigration judge and then in his supplemental briefs, is whether the sterilization of his wife was involuntary. As to their other claims, let me just address this, the house, the confiscation of the house. There was no testimony about that at all during the hearing before the immigration judge, and no mention of it was made in the opening brief before this Court. So to the extent he made that claim in his initial affidavit, he seems to have abandoned it. And, in fact, his testimony seems to have changed. That's not really a claim. That's kind of part of the whole. I mean, if you read the country reports, that's part and parcel of the whole coercive population. According to the State Department, I don't know if you're asserting that the State Department's wrong in saying that, but it does seem to be part and parcel of the claim. No, my only argument is that during his hearing before the immigration judge, that was his opportunity to discuss his asylum claim. And it's clear from his testimony that his asylum claim was based on the sterilization of his wife. That is, again, the only issue he mentions in his brief before this Court. So the issue for this Court to consider, as he has raised, is the sterilization of his wife. That's really the only basis upon which he is now claiming asylum. And the central issue with respect to the sterilization of his wife is whether or not it was voluntary. Does it matter whether it's – let's say it this way. Let's assume that the translation is accurate and assume it against him, that is to say, that once he'd had his son, he was entirely indifferent as to whether or not his wife was sterilized. So as to him, it was voluntary. Let's assume, however, it was involuntary as to her. Does he have that on a claim? I believe he would. So the question is not whether it was okay with him. The question is whether it was okay with her. Well, I think the question is whether it was okay with both of them. No, you gave me a different answer. I asked you, I'm assuming that it is okay with him. Does he still have a claim that it is only not okay with her? What's the answer to that? I believe he would. The statute says involuntary sterilization. The only question on which he needs to prevail then is whether or not it was involuntary as to the wife. Correct? I think that's what you just said. I believe that's correct. But I also think that the standard of review in this case is very important because the question is whether the evidence compels the conclusion that it was involuntary as to her. And at best, the testimony is equivocal. Why is it equivocal? Because there's nothing in here that unequivocally establishes that she was unwilling to go in for sterilization. What he says is that she was willing. Nowhere does he say she was not willing. Nowhere does he say that she ran away at that point. There's some vague testimony about... Is that the standard? I mean, we just have a recent case called Dean v. Ashcroft, which talks about forced and the definition of forced, and it seems to be broader than you have to run away in order for it not to be forced. I mean, she had a notice. Clearly, they had been through a history of fines and other means of persuasion. I mean, how much? I mean, where are you going to draw the line here on a... I mean, she didn't just, on her own, go to the hospital and say, well, now that we've had four children, I'm ready to have a tubal ligation so we don't have any more. There are a lot of things that precipitated her ending up at that hospital, and at one point Lynn says that she had to be willing. Well, again, that's why I think the evidence at best is equivocal. The word he uses is the word willing, and he never says... I mean, I think it's important to focus on what he never says. He never says she didn't want to go. Almost every case I could find in the Ninth Circuit, there was either physical compulsion or some sort of coercion. Well, I'm trying not to read anything into this, but the last answer on page 76 sounds like they just gave up to the pressure. And so why did she not run away the second time? At the time, because of the extra children, and we were being fined, so we went to our brothers and asked them to borrow the money, then to ask her to come back to have the operation done, but then at the time we didn't have the money. So it sounds like they gave up under the pressure. Well, I don't think that that much can be read into that statement. I think what's important in this case is that he never says. It would have been very simple to say she did not want to. She was not willing, and he never does. What he does say is that she was willing. And then he says, and while her state of mind is important as well, he doesn't say it was fine by me, but it wasn't fine by her. I mean, he says it's fine by me. Let me ask you this. One of the things the I.J. says is that, well, he says it's fine with him. He says she was, quote, willing. And in any event, they already had four children. She was 32 years old. They could barely feed the kids anyway. I cannot imagine. I'm now putting words in his mouth, but this is what the I.J. meant. I cannot imagine they wanted to have any more children. Let's assume that the I.J. is right, that they didn't want any more children. But let's also assume that she did not want to go through a tubal ligation. That's a serious operation. And maybe they had in mind, you know what, that's a serious operation with risk of injury or even death. We would prefer not to have any more children, but we would prefer to have alternative methods of birth control. If that tubal ligation was involuntary in that context, that is to say, she didn't want any more children, but she also didn't want the operation. If it is totally involuntary, but for the reason I've just given you, is that on a protected ground? Does that state a claim? It might, depending on, I mean, the fact that you assumed in that hypothetical, the key fact that's not present here, is that there's clear evidence that she wasn't willing to go in for the sterilization. But I'm also assuming that the reason she didn't want to go, for purposes of this hypothetical, was not because she wanted more children. She just didn't want the operation. Well, if it was involuntary within the terms of the statute. Then it's fine. So the fact that she might have wanted more children or not wanted more children was irrelevant. Well, I don't think it's irrelevant in this case, because it goes to the question of whether or not it was voluntary, which is a different question from your hypothetical. Right, I understand that. But when the IJ says they didn't want any more children, the only way we can use that is as trying to figure out whether or not she was willing or unwilling to have the operation. That's correct. Okay. I mean, this case hinges on what involuntary means. But just to be clear, she does have a claim, even if she wants no more children, but simply does not want the operation. Well, it would depend on the facts of that case. I mean, I think it would depend on what exactly happened and whether that would fall within involuntary. If you look at the Eighth Circuit case that we cited in our brief, there the court found that substantial evidence supported the finding that she may not have wanted the abortion. I think it was an abortion in that case. She may not have wanted it, but she chose to have it for reasons that may not have been entirely based or based at all on what might happen if the government found out. And the Eighth Circuit in that case found that wasn't persecution. So I think it depends on the particular facts of the case. If the court has nothing further. Thank you. All right. Thank you very much, counsel. Lynn v. Gonzalez is submitted. We'll take it. Tang v. Gonzalez.
judges: Trott, Wardlaw W. Fletcher